No. 97-261

IN THE SUPREME COURT OF THE STATE OF MONTANA

1998 MT 121


STATE OF MONTANA,

Plaintiff and Respondent,

v.

EDWIN A. TAYLOR,

Defendant and Appellant.


APPEAL FROM:   District Court of the Eighteenth Judicial District,
In and for the County of Gallatin,
The Honorable Frank Davis, Judge presiding.


COUNSEL OF RECORD:

For Appellant:

Bernard J. "Ben" Everett; Knight, Dahood, McLean & Everett;
Anaconda, Montana

For Respondent:

Hon. Joseph P. Mazurek, Attorney General; John Paulson,
Assistant Attorney General; Helena, Montana

Marty Lambert, Gallatin County Attorney; Elizabeth Horsman-Wiitala,
Barbara C. Harris, and Kathy Seeley, Assistant Attorneys
General and Special Deputy County Attorneys; Bozeman, Montana


Submitted on Briefs: March 19, 1998

Decided:   May 8, 1998
Filed:

_____

Justice Terry N. Trieweiler delivered the opinion of the Court.

¶1    The defendant, Edwin A. Taylor, was charged by information in the District Court for the Eighteenth Judicial District in Gallatin County with three counts of felony theft based on workers' compensation claims that he had filed. Taylor moved to dismiss the information for unconstitutional pre-indictment delay. The District Court denied that motion. Taylor pled guilty to one count of theft and now appeals the denial of his motion to dismiss. We reverse the order and judgment of the District Court.

¶2    The sole issue on appeal is whether pre-indictment delay violated Taylor's constitutional right to due process.

FACTUAL BACKGROUND

¶3    Edwin A. Taylor was employed by the Montana Highway Department in 1990. On March 30, 1990, Taylor reported to the State Fund a work-related injury that he alleged had occurred on February 26, 1990. The State Fund accepted liability and paid Taylor $5,591.64 for disability benefits and $17,161.70 for medical benefits. Taylor had surgery on his neck in July, but returned to work in September 1990. His treating surgeon was Dr. James Johnson.

¶4    Taylor claimed that a second work-related injury occurred on November 15, 1990. He received $274.47 for medical expenses related to that claim. Finally, Taylor claimed that a third work-related injury occurred on March 4, 1991. The State Fund paid approximately $36,000.00 for disability benefits and $18,000.00 for medical expenses related to that claim. Although Taylor had not returned to work, the State Fund terminated Taylor's benefits in April 1994.

¶5    In May 1991, the State Fund began an investigation into Taylor's claims after it received reports that they were fraudulent. In August of that year, the State Fund referred the matter to the Department of Justice, Criminal Investigation Bureau, for further investigation. The State contends that the CIB referred the investigation to the Gallatin County Attorney on April 22, 1992. Taylor contends that the decision to refer the case to the Gallatin County Attorney was made on January 31, 1992.

¶6    After the County Attorney's office reviewed the matter, it contacted the CIB agent, Brian Costigan, on September 8, 1992, to request that he conduct further investigation. The County Attorney's office received Costigan's report on approximately October 6, 1992. In April 1993, Deputy County Attorney Jane Mersen was appointed to prosecute the case, although she was on maternity leave from May until July of that year. Mersen contacted Costigan again in October 1993, to request further investigation. Shortly thereafter, the County Attorney hired Assistant Attorney General Elizabeth Horsman-Wiitala to prosecute this case, and she was appointed special counsel for that purpose on December 13, 1993.

¶7    The State Fund remained in frequent contact with the County Attorney's

office about its progress in the matter, since it continued to pay Taylor's benefits and apparently deferred its investigation of his claims in favor of the investigation by the County Attorney's office. In addition, Taylor and his attorney were in contact with the County Attorney's office and other investigators to facilitate resolution of the matter. On January 13, 1994, Taylor's counsel wrote Horsman-Wiitala about, among other things, the effect of the delay on Taylor, their past and ongoing desire to cooperate in the investigation, and the perceived violation of his client's constitutional rights.

¶8   On March 9, 1994, Horsman-Wiitala filed a motion for leave to file information in the District Court, and a week later filed an information charging Taylor with three felony counts of theft, pursuant to §§ 45-6-301(5)(b) and -301(7), MCA. In the charging documents, it was alleged that Taylor fraudulently received workers' compensation benefits in the amount of $74,526.59 for the three claims. Taylor appeared on May 11, 1994, and pled not guilty.

¶9   After the information was filed, the State Fund terminated Taylor's benefits and began proceedings against Taylor in the Workers' Compensation Court. Taylor filed a response in the Workers' Compensation Court and sought reinstatement of his benefits; the Workers' Compensation Court consolidated the claims and set a trial date.

¶10  On August 19, 1994, Taylor moved the District Court to dismiss the information based on a lack of jurisdiction, or in the alternative to stay the District Court proceedings until the Workers' Compensation Court made its determination. He also moved the District Court to dismiss the information based on alleged denial of due process from the length of pre-indictment delay. Taylor alleged that the County Attorney's office "inexcusably procrastinated" in bringing the charges, and that he had suffered severe prejudice, both psychologically and to his defense, due to the impairment of witnesses' memories. The State, in response, contended that the delay was not intentional or for tactical advantage and that Taylor's allegations of prejudice were insufficient for dismissal. After oral argument, the District Court, on October 24, 1994, denied the motion to dismiss and reserved its ruling on the motion to stay. The order stated that there was no showing of actual or substantial prejudice, and that the State had gained no tactical advantage from the considerable, albeit "excusable" delay.

¶11  The District Court reserved its decision to stay because at the time, the Workers' Compensation Court trial was expected to be completed by the date set for trial in the District Court. As it stated in another pre-trial decision, "a resolution of that cause could very well make the criminal matter moot." After a number of delays (which necessitated corresponding delays in the District Court), the trial in the Workers' Compensation Court was finally held on February 23 and 24, 1995.

¶12  On August 21, 1995, the Workers' Compensation Court held that the November 15, 1990, and March 4, 1991, claims of injury were fraudulent, and entered judgment in the amount of $55,362.85 against Taylor. It found a suspicion of fraud regarding the February 26, 1990, injury, but found that there

was insufficient evidence to conclude that the claim was fraudulent.  Taylor eventually appealed the Workers' Compensation Court judgment to this Court, and we affirmed the Workers' Compensation Court.  See Taylor v. State Compensation Ins. Fund (1996), 275 Mont. 432, 913 P.2d 1242.  On August 28, 1995, the District Court set March 25, 1996, as the trial date.

¶13  On January 24, 1996, Taylor moved the District Court to reconsider its previous denial of his motion to dismiss based on pre-indictment delay.  His motion was based on the fact that at the time that he filed the first motion, Taylor was unaware that two key witnesses had died during the period of pre-indictment delay.  He stated that his primary physician after the February 26, 1990, injury, Dr. James Johnson, had died on October 24, 1993, and that the psychologist, Dr. Richard Traynham, who had examined Taylor at the request of the State Fund, and concluded that he suffered depression as a result of his work-related injuries, had died on April 15, 1993.  The motion explained briefly the nature of the testimony they would have given and its importance to Taylor's case.  Their testimony had not been preserved prior to their deaths.

¶14  The State's response alleged that Taylor's motion was untimely, that Taylor should have discovered Johnson's death sooner than he did if the testimony was in fact critical to his defense, and that Taylor had initiated post-indictment delay which rendered disingenuous his claim of pre-indictment delay.

¶15  On February 14, 1996, the District Court denied the motion to reconsider without explanation, and based on its earlier reasoning in response to Taylor's motion to stay, it also granted a motion from Taylor to continue the trial date until this Court could issue its decision in the appeal from the Workers' Compensation Court decision.  A month later and after this Court affirmed the judgment of the Workers' Compensation Court, the district court trial was set for July 22, 1996.  The trial was continued several times until, finally, on February 6, 1997, Taylor entered a guilty plea to Count III regarding the March 4, 1991, injury and Counts I and II were dismissed.  The District Court deferred imposition of sentence for three years and placed Taylor on probation, subject to his compliance with the order from the Workers' Compensation Court and his performance of community service, among other conditions.  The plea agreement reserved Taylor's right to appeal the denial of  his motions to dismiss for pre-indictment delay.

                              DISCUSSION

¶16  Did pre-indictment delay violate Taylor's constitutional right to due process?

¶17  The State suggests that we should review a district court decision to grant or deny a motion to dismiss for pre-indictment delay for abuse of discretion.  Taylor, on the other hand, contends that the district court's decision constitutes a question of law for which this Court's review is plenary.  We have not expressly set forth our standard of review for decisions regarding pre-indictment delay.

¶18   We recognize that the question of post-indictment delay or whether a defendant's right to speedy trial has been violated is a question of constitutional law which requires that we review a district court's decision to determine if it is correct.  See State v. Small (1996), 279 Mont. 113, 116, 926 P.2d 1376, 1378; State v. Cassidy (1978), 176 Mont. 385, 388, 578 P.2d 735, 737.  A speedy trial analysis, which focuses on post-indictment delay, involves an inquiry similar to that which we engage in for pre-indictment delay.  Therefore, we conclude that we should also review a district court's decision regarding a pre-indictment delay as a question of constitutional law.

¶19   We review a district court's conclusions of law to determine whether its interpretation of the law is correct.  See Carbon County v. Union Reserve Coal Co. (1995), 271 Mont. 459, 469, 898 P.2d 680, 686; see also Kreger v. Francis (1995), 271 Mont. 444, 447, 898 P.2d 672, 674; Steer, Inc. v. Department of Revenue (1990), 245 Mont. 470, 474-75, 803 P.2d 601, 603-04.

¶20   We held in State v. Krinitt (1991), 251 Mont. 28, 823 P.2d 848, that our consideration of a defendant's claim that pre-indictment delay has violated his right to due process pursuant to the Fifth and Fourteenth Amendments of the United States Constitution involves a two-step process.  First, the defendant has the burden to show that he has suffered actual and substantial prejudice from the delay.  Then, if he has shown sufficient prejudice, we must weigh the reasons for the delay offered by the State, as well as the length of the delay, to determine whether the defendant's rights have been denied.  Throughout our analysis, we should be guided by the principle that a pre-indictment delay will lead to a violation of a defendant's due process rights if it can be said that requiring the defendant to stand trial "violates those fundamental conceptions of justice which lie at the base of our civil and political institutions and which define the community's sense of fair play and decency."  Krinitt, 251 Mont. at 35, 823 P.2d at 852 (quoting United States v. Lovasco (1977), 431 U.S. 783, 790, 97 S. Ct. 2044, 2049, 52 L. Ed. 2d 752, 759).

¶21   The State contends that Taylor was not prejudiced by the delay because the death of the two doctors did not prevent him from establishing the essential aspects of his defense and that their testimony would not have been very helpful to his defense.  It is difficult to assess prejudice when a defendant has pled guilty and there has been no trial.  However, the findings of the Workers' Compensation Court are of some assistance.

¶22   The majority of the Workers' Compensation Court's findings address Taylor's claim that he was injured on March 4, 1991.  The State contended, and the Workers' Compensation Court found, that Taylor was not injured on that date and, therefore, that his claim was fraudulent.  Taylor contends that Dr. Johnson's and Dr. Traynham's testimony would have helped prove the March injury.

¶23   Johnson had operated on Taylor after the February 1990 injury.  He also treated Taylor in August 1991 for complaints which Taylor related to a March 4, 1991, accident. Taylor contends, and we agree, that Johnson's knowledge of Taylor's condition before and after the claimed injury, and his understanding of the effect of the trauma reported, would have allowed him

to express an opinion whether Taylor's physical condition after March 1991, and the symptoms that Taylor reported were related to the incident and injury that he claimed. Dr. Traynham previously expressed the opinion that Taylor's depression was related.

¶24 The mere loss of a potential witness does not constitute actual and substantial prejudice sufficient to implicate a defendant's due process rights. In addition, we recognize that a defendant's bare speculation that a lost witness's testimony would have been exculpatory is insufficient to prove actual prejudice. See State v. Goltz (1982), 197 Mont. 361, 367, 642 P.2d 1079, 1082.

¶25 Here, however, Dr. Johnson's ability to discuss the mechanics of the incident which Taylor claimed occurred on March 4, 1991, in the context of Taylor's overall history and symptoms was obviously important to Taylor's defense. We reject the notion that because Taylor is unable to give specific details of that testimony, we are precluded from concluding that its loss was prejudicial. Dr. Johnson died before the information was even filed; there is no obligation for a potential defendant to obtain and develop the testimony of witnesses who eventually may become important if charges are someday filed. The value of Dr. Traynham's opinion is obvious.

¶26 Moreover, we also recognize that, at least in the Workers' Compensation Court, Taylor's credibility was questioned. That court's conclusion about his lack of credibility was critical to its decision. Any evidence which would have corroborated his version of the events, even if only by confirming that the event he described was consistent with the type of injury he claimed, was critical to his defense. The missing testimony takes on added significance when we consider the greater burden of proof imposed on the State in the criminal proceeding compared to the State Fund's burden in the Workers' Compensation Court. The delay here led to the loss of two potentially credible and persuasive witnesses who, in the view of a jury, may have exculpated Taylor, or at least corroborated his testimony sufficiently to support acquittal.

¶27 We conclude that the doctors were two key witnesses and that without their testimony, Taylor was actually and substantially prejudiced in his ability to defend himself.

¶28 Our analysis of the State's reasons for the delay further persuades us that the delay constituted a violation of Taylor's due process rights.

¶29 The State suggests that whatever prejudice Taylor has shown is insignificant to the more important necessity of allowing the State reasonable time to investigate the crime. We agree that the criminal justice system and the State should put a premium on conscientious investigation. We disagree, however, with the State's implicit suggestion that the delay in this case was a necessary function of its conscientious investigation.

¶30 The only justification that the State offers for an approximately two-year delay is its statement that the Workers' Compensation Court's findings

"show that the medical evidence was voluminous and complex." We are unpersuaded by these vague assertions in view of the lengthy periods of inactivity that resulted after the case was referred to the County Attorney's office. For example, over four months passed from the time that the County Attorney's office was referred the case in April 1992, to the time that it requested further investigation in September 1992. Approximately six months passed from when the County Attorney's office received its first investigative report in October 1992, to the time that it appointed Mersen to prosecute the case in April 1993. Another two months passed while Mersen was on maternity leave, and then at least two additional months passed before a second request for investigation was made in October 1993.

¶31 The County Attorney's office was well aware of the State Fund's interest in the case, since the State Fund investigator contacted the office numerous times to offer assistance and to request updates on the case. The State Fund relied, in large part, on the State to determine the viability of Taylor's claims, and so long as the State neglected the matter, the State Fund was forced to continue to pay Taylor's benefits, despite its suspicions. Those frequent inquiries, however, appear to have done little to stimulate prosecution or investigation of the case.

¶32 Counsel for Taylor also contacted the County Attorney's office on a number of occasions to offer his and his client's cooperation in the matter. In a letter dated June 10, 1993, Taylor's counsel expressed his client's frustration with the delay and clearly put the County Attorney's office on notice that the delay was having a detrimental effect on his client's well-being, not to mention his potential defense. Despite these attempts by all the other parties involved with the case, the County Attorney's office waited until March 1994, to charge Taylor.

¶33 The State has provided no satisfactory explanation for the overall delay, nor has it explained how the specific periods of virtual inactivity described above comport with a conscientious and reasonable investigation. Most importantly, beyond its cursory reference to the medical evidence in this case, the State has failed to suggest any reasons why this case required nearly two years of investigation. In the past, we have held that the complexity of the evidence in a case, without any more explanation from the State, may suffice to explain the pre-indictment delay. See State v. Curtis (1990), 241 Mont. 288, 298-99, 787 P.2d 306, 312-13 (422-day delay in a bank theft charge). That is not the situation here, given the length of delay and the fact that significant investigation had already been done by the time that the County Attorney's office was referred the case.

¶34 We acknowledge that prosecutors have no duty to file charges as soon as possible, and that reasonable pre-indictment delays ultimately protect both the State and the defendant. See Lovasco, 431 U.S. 783, 97 S. Ct. 2044, 52 L. Ed. 2d 752. However, in light of the loss of potential testimony described above, the length of delay, and the lack of any justification for the delay in this case, we conclude that this pre-indictment delay was unreasonable and, therefore, that Taylor's constitutional right to due process was violated.

¶35 We reverse the judgment of the District Court and dismiss the information that is the subject of this appeal.

/S/   TERRY N. TRIEWEILER

We Concur:

/S/  J. A.  TURNAGE
/S/  JIM REGNIER
/S/  WILLIAM E. HUNT, SR.

Justice W. William Leaphart, specially concurring.

¶36 I concur in the result reached by the Court but not in everything that is said in the Court's opinion.  In particular, I think that the Court overstates the obviousness of the value of the two doctors' opinions.   The underlying issue in this case is whether or not Taylor was guilty of defrauding the State Fund by claiming that he was injured on the job, March 4, 1991, while picking up safety cones.  According to other witnesses, Taylor gave other inconsistent explanations of the injury, e.g., that he was operating a jack hammer or that he slipped on some road oil. Although Dr. Johnson treated Taylor for his injuries and Dr. Traynham for his depression, neither doctor was a witness to the actual incident and thus neither could testify as to whether he was injured in the manner claimed or even injured on the job.  As is typical in doctor-patient relationships, their information as to how the incident occurred was obtained second hand through Taylor whose credibility is the issue at hand.  Nonetheless, as a treating physician, Dr. Johnson could at least have given an opinion as to whether the physical injuries he treated were consistent with the mechanics of the unwitnessed incident which Taylor claimed occurred.  I agree that, to the extent Dr. Johnson's opinion could have corroborated Taylor's version of the events, it was important to his defense.

¶37 Dr. Traynham was a  psychologist who had examined Taylor at the request of the State Fund and rendered an opinion that Taylor's depression "is a function of both the underlying personality pattern and the work place stresses and injuries the claimant experienced. . . ."  His opinion that the depression was related to the work place injuries assumes, of course, that Taylor was credible when he said he suffered the injuries in the work place. Dr. Traynham was not in a position to state whether the injuries actually occurred or were, in fact, work related. Unlike Dr. Johnson, he did have the benefit of objective findings with which he could corroborate Taylor's credibility.  In my view, the value of Dr. Traynham's opinion was less than "obvious," it was negligible.

¶38 Nonetheless, since this case involved a criminal charge of fraud, Taylor's credibility was pivotal.  Dr. Johnson could have indirectly bolstered Taylor's credibility  and thus Taylor was prejudiced by his unavailability. For that reason, I concur in the result reached by the Court.

/S/   W. WILLIAM LEAPHART